UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| JENNIFER M. GLAUSER, | : | Bankruptcy No. 05-19233DWS |
| | : | |
| Debtor. | : | |

| | | |
|---|---|---|
| JENNIFER M. GLAUSER, | : | Adversary No. 05-0527 |
| MARK GLAUSER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| DEUTSCHE BANK NATIONAL TRUST | : | |
| COMPANY, | : | |
| AMERIQUEST MORTGAGE COMPANY, | : | |
| | : | |
| Defendants. | : | |

## ORDER

**AND NOW**, this 3rd day of April, 2007, upon consideration of the Complaint of the Plaintiffs Jennifer and Mark Glauser against Defendants Deutsche Bank National Trust Company ("Deutsche Bank") and Ameriquest Mortgage Company ("Ameriquest," collectively with Deutsche Bank, the "Defendants"), after trial and consideration of the parties' memoranda, and for the reasons stated in the accompanying Memorandum Opinion,

It is hereby **ORDERED** that judgment is entered **In Favor Of Defendants** and against Plaintiffs.

_____
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re | : Chapter 13 |
| JENNIFER M. GLAUSER, | : Bankruptcy No. 05-19233DWS |
| Debtor. | : |
| | |
| JENNIFER M. GLAUSER, MARK GLAUSER, | : Adversary No. 05-0527 |
| Plaintiffs, | : |
| v. | : |
| DEUTSCHE BANK NATIONAL TRUST COMPANY, AMERIQUEST MORTGAGE COMPANY, | : |
| Defendants. | : |

## MEMORANDUM OPINION

**BY: DIANE WEISS SIGMUND, Chief Bankruptcy Judge**

Plaintiffs Jennifer and Mark Glauser ("Jennifer" and "Mark" and collectively "Plaintiffs") filed this adversary proceeding against Defendants Deutsche Bank National Trust Company ("Deutsche Bank") and Ameriquest Mortgage Company ("Ameriquest"), claiming that a loan transaction they entered into with Ameriquest in 2004, subsequently assigned to Deutsche Bank, violated the federal Truth in Lending Act ("TILA").

The dispositive issue is whether Ameriquest overcharged Plaintiffs for title insurance when it charged them the "basic" rate rather than the lower "refinance" rate, so as to make it an unreasonable charge that should have been disclosed as part of the finance charge. After trial and a review of the evidence presented, and for the reasons stated below, I find that Plaintiffs failed to meet their burden of proving that they were entitled to the refinance rate. As the basic rate was therefore not an unreasonable charge, there was no disclosure violation committed by Ameriquest that would subject it to TILA liability.[1]

## FINDINGS OF FACT

Plaintiffs are husband and wife and co-owners of property located at 14 Bark Hollow Lane, Horsham, Pennsylvania (the "Home").[2] They purchased the Home on December 12, 2001, and financed the purchase with a mortgage loan from Wells Fargo Mortgage Resources ("Wells Fargo" and the "Wells Fargo Loan").[3]

There is no question but that title insurance was secured with respect to the Wells Fargo Loan. The HUD-1 Settlement Statement for the Wells Fargo Loan ("Wells Fargo HUD-1") indicates a charge of $1,008.75 for title insurance paid to the closing agent,

---

[1] Deutsche Bank is the subsequent assignee of the loan. See Joint Pretrial Statement § II ("Uncontested Facts") ¶ 17. Plaintiffs concede that Deutsche Bank had no involvement with the underlying loan transaction at issue in this case. Because I find that Plaintiffs failed to prove a TILA violation by Ameriquest, I need not address Deutsche Bank's liability as assignee of the loan.

[2] Uncontested Facts ¶ 9.

[3] Trial Transcript (Tr.) at 6; HUD-1 Settlement Statement, Exhibit P-1.

Diamond Abstract.[4] The "Owner's Policy of Title Insurance" issued by Fidelity National Title Insurance Company ("Fidelity" and the "Fidelity Policy") dated January 24, 2002 was introduced by Plaintiffs.[5] The Fidelity Policy is a form document, with the information specific to the insured property being found in Schedule A. The attached Schedule A provides the following information: (1) it identifies the "insureds" as Plaintiffs; (2) it identifies the estate as "fee simple;" (3) it identifies Wells Fargo's recorded lien; and (4) it states that the insured property is in Montgomery County, Pennsylvania as further described in the "Attached Schedule A Continuation Page." Plaintiffs did not produce the referenced Schedule A Continuation Page.

On January 13, 2004 Plaintiffs entered into a new loan with Ameriquest (the "Ameriquest Loan"), which, inter alia, refinanced the Wells Fargo Loan.[6] The Ameriquest Loan is the transaction at issue in this adversary proceeding. A threshold factual dispute is whether Ameriquest was provided with any documents evidencing that title insurance was issued in the Wells Fargo transaction. Mark testified at trial that at Ameriquest's request, he transmitted by facsimile a copy of all the documents he had from the Wells Fargo Loan, including the Wells Fargo HUD-1 and the Fidelity Policy.[7] I do not find his testimony credible. It directly contradicts Plaintiffs' responses to Ameriquest's Interrogatories and

---

[4] Exhibit P-1.

[5] Exhibit P-2.

[6] Uncontested Facts ¶ 1.

[7] Tr. at 8-9, 25.

the Jennifer's deposition testimony, both of which indicate Plaintiffs only provided Ameriquest with tax returns.[8] There was no corroborating testimony or documentation to indicate contemporaneous transmission of the Wells Fargo HUD-1 and Fidelity Policy. On the other hand, Ameriquest's representative, Michael Monsera, testified that he conducted a search of Ameriquest's records pertaining to the transaction and did not locate either the Wells Fargo HUD-1 or the Fidelity Policy.[9]

The January 13, 2004 closing for the Ameriquest Loan was conducted by Express Financial Services, Inc. ("Express"), an independent contractor that provides closing services for Ameriquest, including title searches and issuing title insurance.[10] Documents presented to Plaintiffs at the closing included a Federal Truth-in-Lending Act Disclosure Statement ("TILA Statement"),[11] a HUD-1 Form Statement (Ameriquest HUD-1),[12] and a Notice of

---

[8] Compare Tr. at 25 with Plaintiffs' Responses to Defendant's First Set of Interrogatories No. 8, Exhibit D-18, and Deposition Transcript of Jennifer Glauser ("J. Glauser Dep.") at 39, Exhibit D-17. I am also not impressed with Mark's testimony that he retained all documents from the Wells Fargo settlement, including the Title Policy and HUD-1, in a blue folder at home when the Title Policy introduced at trial bore the a facsimile legend dated two years after the Wells Fargo closing of a transmission from Plaintiffs' counsel. Exhibit P-2. Finally Mark's credibility as a witness is undermined by his admitted misstatements in an affidavit filed in opposition to Defendants' motion for summary judgment. Tr. at 42-47.

[9] Tr. at 148-49.

[10] Tr. at 170 (testimony of Scott Bell, General Counsel for Express); Exhibit P-4, Ameriquest HUD-1 (identifying Express).

[11] Exhibit P-3.

[12] Exhibit P-4.

Right to Cancel ("Cancellation Right Notice").[13] Plaintiffs had an opportunity to read the loan documents at the loan closing and did not ask any questions.[14]

Mark admits that he did not tell Express' representative that they had title insurance issued with respect to Well's Fargo Loan.[15] Plaintiffs were charged $1,178.75 for title insurance procured by Express through Stewart Title Guaranty Company ("Stewart").[16] This amount represents the "basic rate" for title insurance on a loan the size of the Ameriquest Loan according to the Manual of Title Insurance Rating Bureau of Pennsylvania (the "TIRBOP Manual").[17] Ameriquest agrees that this charge was <u>not</u> included in the calculated "finance charge" disclosed by the TILA Statement.

As noted, the Ameriquest Loan was subsequently sold and assigned to Defendant Deutsche Bank as trustee for Ameriquest.[18] Plaintiffs fell behind on their mortgage payments, and a mortgage foreclosure action was instituted against them. No judgment in foreclosure has been entered against them.[19] On or about July 1, 2005, Plaintiffs' counsel

---

[13] Exhibit P-5.

[14] Tr. at 58.

[15] Tr. at 48.

[16] Ameriquest HUD-1, Exhibit P-4.

[17] TIRBOP Manual, Addendum A, Exhibit P-8. The total title insurance charge is actually $1,423.75, which includes the basic rate of $1,178.75 as well as other components such as endorsements, closing protection letter and tax certification. Exhibit D-9 ("Express Financial Disbursement Report"). However, it is only the propriety of the basic rate which is at issue here.

[18] Uncontested Facts ¶ 17.

[19] Tr. at 28-30.

forwarded a letter to Deutsche Bank asserting, inter alia, an overcharge of title insurance giving rise to a violation of the Federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), and asserting a right to rescind the loan.[20] By letter dated July 20, 2005, Ameriquest denied that Plaintiffs had a right of rescission.[21] Jennifer filed a Chapter 13 petition on July 7, 2005. Plaintiffs filed this adversary proceeding on August 19, 2005.

## DISCUSSION

### A.

The purpose of TILA is to aid unsophisticated consumers lest they be easily misled as to the costs of financing. Shepeard v. Quality Siding & Window Factory, 730 F.Supp. 1295, 1299 (D. Del. 1990). To that end, TILA and the regulations promulgated thereunder require certain disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit. Id.

Pursuant to TILA, a lender must make certain material disclosures, including the "finance charge" associated with the loan. 15 U.S.C. §§ 1602(u), 1638(a); 12 C.F.R. §§ 226.17, 226.18.[22] This defined term includes all of those charges "payable directly or

---

[20] Exhibit P-7.

[21] Exhibit P-8.

[22] In 15 U.S.C. § 1604, Congress authorized the Federal Reserve Board to "prescribe regulations to carry out the purposes" of TILA. Pursuant to this authority, the Federal Reserve Board promulgated "Regulation Z," which is memorialized in 12 C.F.R. § 226. Rossman v. Fleet Bank (R.I.) National Association, 280 F.3d 384, 389 (3d Cir. 2002). The Board "also published extensive 'Official Staff Interpretations.' 12 C.F.R. Pt. 226, Supp. I." Id. The Supreme Court has instructed that "[c]ourts should honor that congressional choice. Thus, while not abdicating their

indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit...." 15 U.S.C. § 1605(a). A lender's failure to accurately disclose the finance charge provides a borrower with, among other things, an extended right to rescind the transaction up to three years following consummation of the loan. 15 U.S.C. § 1635(f); 12 C.F.R. § 226.23. That right may also be asserted against an assignee of the loan. 15 U.S.C. § 1641(c).

Of relevance here, where the transaction involves an extension of credit secured by an interest in real property, certain real estate related costs, including title insurance, are specifically excluded from the finance charge calculation. 15 U.S.C. § 1605(e). However, Regulation Z clarifies that these real estate charges may be excluded only if they are bona fide and reasonable. 12 C.F.R. § 226.4(c)(7)(I). The only real estate charge challenged here is the "basic rate" title insurance charge of $1,178.75. There is no dispute that the title insurance charge is bona fide. Rather, Plaintiffs contend that the amount is not reasonable because they were entitled to the lower "refinance" rate under the TIRBOP Manual. As such, they argue that the title insurance charge is unreasonable and should have been included in the finance charge.

---

ultimate judicial responsibility to determine the law... judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational." Ford Motor Credit Company v. Milhollin, 444 U.S. 555, 568, 100 S.Ct. 790 (1980). See also Anderson Bros. Ford v. Valencia, 452 U.S. 205, 219, 101 S.Ct. 2266 (1981) ("absent some obvious repugnance to the statute, 'Regulation Z' should be accepted by the courts, as should the Board's interpretation of its own regulation"). In analyzing the Debtor's contentions, my guideposts are therefore the statutory provisions of TILA as well as Regulation Z and the Official Staff Interpretations.

In determining whether a charge is reasonable, courts have examined whether the disputed charges are comparable to the prevailing rates of the industry in the locality at the time of the transaction. Brannam v. Huntington Mortgage Co., 287 F.3d 601, 606 (6th Cir. 2002) (*quoting* Grigsby v. Thorp Consumer Discount Co. (In re Grigsby), 119 B.R. 479 (Bankr. E.D. Pa. 1990), *vacated on other grounds by* 127 B.R. 759 (E.D. Pa. 1991)). The parties agree that the 2003 TIRBOP Manual in effect at the time of the Ameriquest Loan serves to establish the prevailing rates and thus the "reasonable" rate for purposes of this proceeding (the "2003 TIRBOP Manual").[23] See Johnson v. Know Financial Group, LLC, 2004 WL 1179335, at *6 n.5 (E.D. Pa. May 26, 2004) (accepting Rate Manual as representing the relevant market for title insurance). However, the parties dispute which rate within the 2003 TIRBOP Manual is applicable here.

As noted, Plaintiffs were charged the "basic rate" for title insurance, i.e., $1,178.75. However, the 2003 TIRBOP Manual in effect at the time of the Ameriquest Loan provides for a deviation from the basic rate under the following circumstances:

> When a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or fee interest and the premises to be insured are identical to or part of the real property previously insured and there has been no change in the fee simple ownership, the Charge shall be 80% of the reissue rate.

---

[23] Exhibit P-8. As noted below, the Manual has since been amended, effective August 2005. Infra, note 24.

-8-

2003 TIRBOP Manual § 5.6 (hereinafter the "refinance rate"). The refinance rate applicable to the Ameriquest Loan would be $848.70.[24] The "reissue rate," while not applicable to the refinance transaction that occurred in this case, is relied upon by Plaintiffs to support their interpretation of the requirements of the refinance rate of § 5.6. It states:

> A purchaser of a title insurance policy shall be entitled to purchase this coverage at the reissue rate if the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured transaction closes <u>when evidence of the earlier policy is produced</u> notwithstanding the amount of coverage provided by prior policy.

2003 TIRBOP Manual § 5.3 (emphasis added).[25] As seen from the highlighted language, the reissue rate provision requires "evidence of the earlier policy [be] produced," whereas the refinance rate provision (§ 5.6) does not have this explicit requirement. Plaintiffs contend that the absence of a requirement that the earlier policy be produced in a refinance absolves Plaintiffs from the duty to inform Ameriquest of the Fidelity Policy in connection with the issuance of a new title policy and fixing the charge therefor.[26]

Perhaps anticipating some difficulty with their evidence of submission of the Title Policy and HUD-1 to Ameriquest at closing, the Plaintiffs argue that mere knowledge of a prior loan secured by a mortgage is sufficient to put Ameriquest on notice that a title

---

[24] The reissue rate is 90% of the basic rate. 2003 TIRBOP Manual § 5.50 and Addendum A. Exhibit P-8.

[25] Exhibit P-8.

[26] Notably, the TIRBOP Manual was amended in August 2005, making significant changes that effectively eliminated the confusion giving rise to the dispute here. Among other things, the mere existence of an unsatisfied mortgage to an institution lender is now explicitly defined as evidence which the insurer must rely upon to provide the refinance rate. Exhibit P-12 at 8-9. However, both parties agree that the TIRBOP Manual as amended through April 1, 2003, governs this loan. Nonetheless, Plaintiffs appear to argue for the application of the new rule in this case.

policy may exist. Ameriquest clearly knew about the existence of the Wells Fargo Loan as it appears on the title commitment prepared by Express, which was in Ameriquest's file. According to Plaintiffs, this evidence is sufficient to meet their burden of proof that they were eligible for the refinance rate. That position, however, is not supported by Plaintiffs' own expert witness, William C. Hart ("Hart"),[27] who conceded that this knowledge alone is probably insufficient to demonstrate that Plaintiffs were entitled to the refinance rate:

> Q: Would just the fact that there had been a prior loan, that was a first mortgage on a property that it was purchased, would that be sufficient?
>
> A: Probably not under the then-rate rule [§ 5.6]

Tr. at 99. Indeed, Hart stated that § 5.6 requires some indicia of prior title insurance notwithstanding that § 5.6 does not contain the same explicit requirement to produce the prior policy that is found in § 5.3: "You've got to have something," i.e., such as a HUD-1 form. Tr. at 108.[28] As the facts demonstrate, Ameriquest had nothing. Significantly Hart did not opine that Ameriquest had a responsibility to discover whether title insurance

---

[27] Both Hart and Ameriquest's expert, E.A. Dixon, Jr., Esq. ("Dixon"), were stipulated by the parties as experts in the area of title insurance.

[28] Ameriquest's expert, Dixon was not reticent to define that "something." By reading the 2003 TIRBOP Manual to incorporate the section 5.3 production requirement into the silent 5.6 provision, he concluded that the borrower has a duty to produce the prior policy. While I note that Dixon's interpretation is belied by other sections in the Manual that contain cross-references, indicating that its drafters knew how to expressly incorporate sections when they wished to do so, the outcome of this contested matter is not driven by an interpretation of the 2003 TIRBOP Manual.

had been issued with respect to the prior mortgage loan. Upon my questioning, he stated: "Now, what the extent of Ameriquest's responsibility was, I can't address." Tr. at 103.[29]

Hart did opine that Express had a duty to inquire about prior title insurance. Tr. at 90.[30] Neither the relevance nor the legal correctness of this view was established. Plaintiffs have neither argued nor established that the acts and/or omissions of Express, who is not a defendant in this action, can be imputed to Ameriquest.[31] Moreover Pennsylvania law is clear that "the relationship between the insurance agent and the purchaser reflects 'the quintessential arm's-length relationship, that of seller and buyer,'. . . rather than a confidential relationship. Id. at 22 (*quoting* Weisblatt v. Minnesota Mut. Life Ins. Co., 4 F.Supp. 2d 371, 381 (E.D. Pa. 1998)). Accord Johnson v. Robinson (In re Johnson), 292 B.R. 821,829-30 (Bankr. E.D. Pa. 2003) (doubting that Pennsylvania law would recognize a fiduciary duty between a title company and a borrower). As such, the action or inaction of Express has no bearing on the issue before me, i.e., Ameriquest's duty to affirmatively seek out information to provide the lowest possible title insurance rate to the borrower.

---

[29] In a case with comparable facts discussed infra, it has been noted that absent evidence of special confidence or overmastering dominance, "Pennsylvania courts have held that a lender is not a fiduciary of a borrower." Strong v. Option One Mortgage, 2004 WL 5032530, at *21 (Bankr. E.D. Pa. Aug. 31, 2004).

[30] Plaintiffs' post-trial memorandum misconstrues Hart to have stated that Ameriquest had a duty, but Hart clearly testified that it was Express which bore the burden of determining the title insurance charge and therefore had the burden of inquiry. Tr. at 90, 98, 102-03.

[31] Indeed Plaintiffs' own post-trial submission recognizes Hart's testimony that Express is the agent for Stewart Title Guaranty Company. Tr. at 75.

The extent of Ameriquest's obligation is determined based upon facts that it knew or should have known at the time of the loan transaction. While a lender has some evidentiary burden to demonstrate the reasonableness of loan charges, especially where it has greater access to marketplace information to demonstrate the reasonableness of the fee, a plaintiff nonetheless bears the burden of proving her claims. Fields v. Option One Mortgage (In re Fields), Adv. No. 04-005, slip op. at 28-29, affirmed 2006 WL 2191342 (E.D. Pa. July 31, 2006). In Fields, the parties' stipulation that the plaintiff had obtained title insurance with her prior mortgage, the Plaintiffs' sole evidence here, was insufficient to meet the plaintiff's evidentiary burden on a similar challenge to a title insurance charge. My colleague Judge Bruce Fox found that the plaintiff had an evidentiary burden of production to demonstrate that the defendant knew or should have known at the time of the loan transaction that the plaintiff qualified for the lower insurance rate. Id. at 30. I concur with Judge Fox's conclusion that, at the very least, "if a borrower contends that a lender failed to obtain the lowest title insurance rate permitted by law, she has an affirmative burden to demonstrate that the lender knew or should have known of the facts justifying that lower rate." Id. at 31-32 (citing Jones v. Aames Funding Corp., 2006 WL 2845689, *5-7 (E.D. Pa. Mar. 8, 2006)).

To refute that proposition, Plaintiffs refer to an earlier case by Judge Fox, in Strong v. Option One Mortgage, 2004 WL 5032530 (Bankr. E.D. Pa. Aug. 31, 2004), which also involved the reasonableness of title insurance charges for TILA purposes.[32] In Strong,

---

[32] Strong, and Fields, infra, addressed whether title insurance charges were "reasonable" as defined under the 1994 amendment to TILA, the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 et seq. ("HOEPA"), and the corresponding Regulation Z provision, 12 C.F.R.

the plaintiffs, like the Glausers, failed to produce a prior title insurance policy to the lender, Option One. Nevertheless, at trial they did present other facts to the court, not present here, which proved that Option One knew a prior title insurance policy existed: (1) Option One had obtained the HUD-1 Form from the prior lender that reflected a payment for title insurance; and (2) the entity which Option One hired to obtain title insurance expressly told Option One that it could obtain a lower reissue rate if it received a copy of the Schedule A and B from the previous title insurance policy. Id. at *34.[33] With these facts, Judge Fox placed the burden upon the lender to prove the reasonableness of the title insurance charge based upon its knowledge of the existence of the title policy. Significantly, he did not impose any duty upon Option One to investigate the existence of prior title insurance and never concluded that the mere fact a prior mortgage loan existed was sufficient to require further inquiry. And significantly in the later Fields, decision Judge Fox contrasted the

---

§ 226.32(b)(1). While the parties agree that the Ameriquest Mortgage does not fall under the provisions of HOEPA, courts agree that the definition of "reasonable" is identical as used throughout the TILA statute, including HOEPA and Regulation Z. See Strong v. Option One Mortgage, 2004 WL 5032530, at *41 (Bankr. E.D. Pa. Aug. 31, 2004); Johnson, 2004 WL 1179335, at *8.

[33] Plaintiffs argue that: "Strong is correct when it states that the [court in] Johnson [v. Knox Financial Group, L.L.C., 2004 WL 1179335 (E.D. Pa. May 26,2004)] implicitly accepted the position of the borrowers in that case and the Plaintiffs here that no more than the making of a new loan within the requisite three year period was necessary [to obtain the refinance rate]." Plaintiffs' Proposed Findings of Facts and Conclusions of Law ("Plaintiffs' FOFCOL") at 11. The Johnson court made no such implicit finding (which is also notably contrary to Hart's testimony, supra). The title insurance issue in Johnson was the requirement of § 5.6 of the TIRBOP Manual that there be no change in fee simple ownership. 2004 WL 1179335 at *7. The other requirements of § 5.6 of the TIRBOP Manual, identical property and prior insurance, appear not to have been in dispute. Plaintiffs also misstate Strong's summation of Johnson. Judge Fox merely noted: "Implicitly, therefore, the court in Johnson placed upon the lender the duty to charge the borrower the lowest rate for which he was eligible under Pennsylvania law." 2004 WL 5032530 at *30 (emphasis added).

-13-

record before him to that in <u>Strong</u>, where it was clear that the lender did know or should have known about the prior insurance. <u>Fields</u>, slip op. at 32-33.

In short, I find that Plaintiffs have failed to met their evidentiary burden here, i.e., the existence of facts supporting their claim. Ameriquest neither knew nor should have known about the Fidelity Policy. Hart concedes that nothing in the 2003 TIRBOP Manual creates an independent duty of investigation,[34] and Plaintiffs provide no legal authority for such a proposition. Moreover, even had Ameriquest inquired of the Plaintiffs, the outcome would have been the same since as of the date of their depositions in this adversary proceeding, Plaintiffs did not even know whether title insurance had been issued with the Wells Fargo Loan.[35] The credibility of Mark's self-serving testimony that he provided the Wells Fargo HUD-1 and the Fidelity Policy to Ameriquest is conclusively undermined by the Plaintiffs' pretrial admissions.

### B.

The absence of knowledge about the Fidelity Policy is not the only requirement that rendered the refinance rate unavailable to Plaintiffs. As noted from the plain language of § 5.6 of the 2003 TIRBOP Manual, the premises sought to be insured must also be "identical to or part of the real property previously insured."[36] Plaintiffs bear the burden of proving this criteria was met and that Ameriquest knew, or should have known, this fact. Hart agreed

---

[34] Tr. at 119-20. Indeed, Hart states that his own practice would have been to have obtained a HUD-1 form <u>from Plaintiffs</u>. Tr. at 107-09.

[35] Tr. at 47; Exhibit D-16 at 9; Exhibit D-17 at 14.

[36] 2003 TIRBOP Manual at 6, Exhibit P-8. The third requirement, no change in fee simple ownership, is not disputed here.

on cross that one would need a legal description from the prior policy or title commitment to make this determination, "[b]ecause many companies improperly don't attach metes and bounds descriptions and make references to tax lots or street addresses in an effort to save time, which is wrong." Tr. at 116-17. Indeed, the Fidelity Policy placed into evidence by Plaintiffs fails to supply even a street address or tax lot. The only reference to the insured property is to Schedule A, which in turn references the Wells Fargo Mortgage, the Mortgage/Land Record Book number and page on which it is recorded, and the notation: "See Attached Schedule A Continuation Page for Legal." The continuation page, which purportedly contains the legal description of the insured property, is not attached.

Plaintiffs clearly had a burden of proof at trial to demonstrate the existence of this essential fact, i.e. that the premises insured in the Wells Fargo Loan is "identical" to that insured in the Ameriquest Loan. Their failure to do so provides a further basis to conclude that the refinance rate was not available to them.[37]

## CONCLUSION

The crux of Plaintiffs' TILA claim is that they were eligible for the refinance rate for title insurance charged with respect to the Ameriquest Loan. At best, they proved that they paid for title insurance in the context of the Wells Fargo Loan and that the Fidelity Policy was issued to them contemporaneously with that transaction. However, nothing on this

---

[37] Mr. Hart testified title insurance policies are generally not recorded, but it is customary for Schedule A or C of such policies to be inserted into the recorded mortgage. Tr. at 118. Thus, proving the identical nature of the property insured would have been as simple as going to the recorded mortgage and extracting the legal description for comparison to the legal description in the title commitment provided by Express. Tr. at 118.

-15-

record demonstrates that Ameriquest knew, or should have known, about the Fidelity Policy. Plaintiffs also failed to meet their burden of proving to the Court that the "identical" premises was insured in both transactions as required by § 5.6 of the 2003 TIRBOP Manual. As such, I cannot find that Ameriquest's charge for title insurance was unreasonable, thus rendering the disclosed "finance charge" inaccurate under TILA. Absent any TILA violation by Ameriquest, Plaintiffs cannot assert a claim for rescission against it or Deutsche Bank as assignee.

For the foregoing reasons, I find that Defendants are entitled to judgment. An Order consistent with the foregoing Memorandum Opinion shall issue.

*/s/ Diane W. Sigmund*

———————————————
DIANE WEISS SIGMUND
Chief U.S. Bankruptcy Judge

Dated: April 3, 2007